## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Nicole Lee Paquet

     v.                               Civil No. 18-cv-205-JL

                                              Opinion No. 2019 DNH 064

Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration

# O R D E R

Nicole Paquet moves to reverse the decision of the Acting Commissioner of the Social Security Administration ("SSA") to deny her application for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423.  The Acting Commissioner, in turn, moves for an order affirming her decision.  For the reasons that follow, the decision of the Acting Commissioner, as announced by the Administrative Law Judge ("ALJ") is affirmed.

## I. Scope of Review

The scope of judicial review of the Acting Commissioner's decision is as follows:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

42 U.S.C. § 405(g).  However, the court "must uphold a denial of social security disability benefits unless 'the [Acting Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the standard of review that applies when an applicant claims that an SSA adjudicator made a factual error,

> [s]ubstantial-evidence review is more deferential than it might sound to the lay ear: though certainly "more than a scintilla" of evidence is required to meet the benchmark, a preponderance of evidence is not.  Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted).  Rather, "[a court] must uphold the [Acting Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (per curiam).

Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).

In addition, "'the drawing of permissible inference from evidentiary facts [is] the prime responsibility of the [Acting Commissioner],' and 'the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [her], not for the doctors or for the courts.'"  Id. (quoting Rodriguez, 647 F.2d at 222).  Thus, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as

it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).

## II. Background

The parties have submitted a Joint Statement of Material Facts. That statement, document no. 11, is part of the court's record and is summarized here, not repeated in full.

Paquet was born in 1982. She has worked as a teacher and as an after-school teacher. She left her most recent job, as a middle-school math teacher, on December 6, 2013. According to the Disability Report that Paquet filed with the SSA, she stopped working: (1) because of her physical and mental conditions; and (2) to take care of her stepson, who had mental-health issues of his own. Paquet's medical records document treatment for, among other things, degenerative disc disease, bulimia, depression, anxiety, and an episode of cardiac palpitation.

Paquet applied for DIB on January 7, 2013, claiming that she became disabled on December 9, 2013, as a result of degenerative disc disease, anxiety, and depression. She did not list bulimia as a disabling impairment.

In April of 2014, Dr. Natacha Sochat, a physician and a state-agency consultant who reviewed Paquet's medical records, provided an opinion on Paquet's physical residual functional

capacity ("RFC").[1]  In it, Dr. Sochat opined that Paquet had the RFC to: (1) lift and/or carry and push and/or pull 10 pounds frequently and 20 pounds occasionally; (2) stand and/or walk (with normal breaks) and sit (with normal breaks) for about six hours in an eight-hour workday.  With respect to postural activities, Dr. Sochat found that Paquet could occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl.  Finally, Dr. Sochat opined that Paquet had no manipulative, visual, communicative, or environmental limitations.

Also in April of 2014, Paquet was seen by Dr. Darlene Gustavson for a consultative psychological examination.[2]  Dr. Gustavson diagnosed Paquet with bulimia nervosa, mild alcohol-use disorder, panic disorder without agoraphobia, and mild recurrent major depressive disorder.  She also offered her opinions on Paquet's then-current level of functioning, but

---

[1] "[R]esidual functional capacity 'is the most [a claimant] can still do despite [his or her] limitations.'" Purdy, 887 F.3d at 10 n.2 (quoting 20 C.F.R. § 416.945(a)(1), a regulation governing claims for supplemental security income that is worded identically to 20 C.F.R. § 404.1545(a)(1), which governs claims for DIB) (brackets in the original).

[2] "A consultative examination is a physical or mental examination or test purchased for [a claimant] at [the SSA's] request." 20 C.F.R. § 404.1519.  (Unless otherwise indicated, all references to the Code of Federal Regulations are to the current, i.e., April 1, 2018, edition.)

because those opinions are not at issue, there is no need to describe them in detail.

In May of 2014, Dr. Edward Martin, a state-agency psychological consultant who reviewed Paquet's medical records, assessed her mental RFC. After acknowledging diagnoses of affective disorders, anxiety-related disorders, somatoform disorders,[3] and substance-abuse disorders, Dr. Martin opined that Paquet had no limitations in the realms of social interaction and adaptation. With respect understanding and memory, Dr. Martin opined that Paquet was not significantly limited in two of three abilities, but was moderately limited in her ability to understand and remember detailed instructions. With respect to sustained concentration and persistence, he opined that Paquet was not significantly limited in seven of eight abilities, including the abilities to: (1) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (2) complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Martin did,

---

[3] When Dr. Martin conducted his assessment, the SSA regulations defined "somatoform disorders" as "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.07 (2016 ed.).

however, opine that Paquet was moderately limited in her ability to carry out detailed instructions.

Also in May of 2014, Dr. Alfredo Perez, an internist who was Paquet's primary care physician, wrote a letter addressed "to whom it may concern," that says, in its entirety: "Given Ms. Paquet's current medical status it would be advisable for her to take a leave of absence from work for one year."  Administrative Transcript (hereinafter "Tr.") 855.  In May of 2015, Dr. Perez wrote a second letter, "to whom it may concern," that states, in pertinent part:

> This letter is an addendum to [a] letter written on 5/28/14 in regards to Ms. Paquet being out of work for a one year period.
>
> As per patient's request, as so stated, these are the medical reasons why she was unable to work: depression, anxiety and chronic lower back pain.

Tr. 448.

Finally, in July of 2015, Wayne Castro, a licensed clinical mental-health counselor who had seen Paquet for a 50-minute session every other week for an unstated length of time, completed a Mental Impairment Questionnaire on Paquet.  Among other things, Mr. Castro opined that Paquet's impairments, or treatment for them, would cause her to miss, on average, more than four days of work per month.[4]

---

[4] Mr. Castro also opined that Paquet had marked difficulties in maintaining social functioning and marked difficulties in

The SSA denied Paquet's application for DIB. Thereafter she received a hearing before an ALJ. At the hearing, the ALJ posed a series of hypothetical questions to a vocational expert ("VE"). In his second question, the ALJ posited a 33-year-old individual with a bachelor's degree, the claimant's work history, and the following limitations:

> [S]he can lift 20 pounds occasionally, ten pounds frequently; can stand or walk for six, sit for six; [has] unlimited use of her hands and feet to operate controls and push and pull; all of the postural functions are at the occasional [level] . . . . [S]he is able to remember locations and work like procedures and understand, recall and carry out short and simple instructions without special supervision; can pay attention and maintain concentration for extended periods; [is] able to adhere to a regular schedule and maintain attendance within customary expectations; [can] complete a normal eight hour workday and 40 hour workweek without unreasonable numbers of interruptions, breaks, absences or episodes of distraction; can ask simple questions; [can] request assistance; [can] accept short and simple instructions and respond appropriately to supervisory criticism and to changes in the work setting.

Tr. 88-89. According to the VE, the person described in the ALJ's second hypothetical question could not perform Paquet's past work as a teacher or as an after-school teacher, but could

---

maintaining concentration, persistence, or pace, but those opinions are not at issue here. <u>See</u> Cl.'s Mem. of Law (doc. no. 8-1) (limiting claim to ALJ's evaluation of Mr. Castro's opinion on absenteeism).

perform the following unskilled light-duty jobs: price marker, mailroom clerk, and laundry classifier.[5]

Subsequently, in response to two hypothetical questions from Paquet's counsel, the VE testified that: (1) a person who was off task between 10 and 15 percent of the time would not be able to hold any job;[6] and (2) absence from work four or more days per month would preclude any employment.

After Paquet's hearing, the ALJ issued a decision in which he determined that claimant had three severe impairments: "degenerative disc disease of the lumbar spine; major depressive disorder, recurrent, mild; and generalized anxiety disorder." Tr. 36. The ALJ did not identify claimant's bulimia as a severe impairment, nor did he discuss that impairment in any way. He went on to find that none of Paquet's severe impairments, either alone or in combination, met or medically equaled the severity of any of the impairments on the SSA's list of impairments that

_____

[5] In response to another hypothetical question from the ALJ, the VE testified that the difficulties with social functioning and concentration, persistence, or pace to that Mr. Castro ascribed to Paquet would preclude all work, if those limitations "seriously interfered with the ability to function independently, appropriately, and effectively on a sustained basis," Tr. 90.

[6] The context of this question makes clear that claimant's counsel derived the limitation in it from claimant's report to Dr. Gustavson that she took frequent naps. See Tr. 91, 418.

are per se disabling.  Next, the ALJ provided the following

assessment of Paquet's RFC:

> [T]he claimant has the residual functional capacity to
> perform light work as defined in 20 CFR 404.1567(b)
> except the claimant can stand and/or walk for up to
> six hours in an eight hour workday and can sit for up
> to six hours in an eight hour workday.  The claimant
> has unlimited use of the feet but can stoop, kneel,
> crouch, balance, and crawl occasionally.  The claimant
> can climb ramps and stairs in addition to ropes,
> ladders, and scaffolds occasionally.  The claimant can
> understand, recall, and carry out short and simple
> instructions without special supervision.  The
> claimant can pay attention and maintain attention for
> extended periods.  The claimant can complete a normal
> eight hour workday and 40 hour work week without an
> unreasonable number of interruptions, breaks,
> absences, or episodes of distraction.  The claimant
> can adhere to a regular schedule and maintain
> attendance within customary expectations.  The
> claimant can respond appropriately to supervisor
> criticism.

Tr. 39.  Based upon the RFC he assessed, and the testimony of

the VE, the ALJ determined that Paquet was unable to perform her

past work but could do the jobs of price marker, laundry

classifier, and mailroom clerk.  Consequently, the ALJ

determined that Paquet was not under a disability from December

9, 2013, through May 26, 2016, which was the date of his

decision.

### III. Discussion

A.  <u>The Legal Framework</u>

To be eligible for disability insurance benefits, a person

must: (1) be insured for that benefit; (2) not have reached

retirement age; (3) have filed an application; and (4) be under a disability. 42 U.S.C. § 423(a)(1)(A)-(D). The only question in this case is whether the ALJ correctly determined that Paquet was not under a disability from December 9, 2013, through May 26, 2016.

To decide whether a claimant is disabled for the purpose of determining eligibility for DIB, an ALJ is required to employ a five-step sequential evaluation process. See 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Purdy, 887 F.3d at 10 (quoting Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001); citing 20 C.F.R. § 416.920, which outlines the same five-step process as the one prescribed in 20 C.F.R. § 404.1520).

At the first four steps in the sequential evaluation process, the claimant bears both the burden of production and the burden of proof. See Purdy, 887 F.3d at 9 (citing Freeman

v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001)); see also Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She must prove that she is disabled by a preponderance of the evidence.  See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).[7]  Finally,

> [i]n assessing a disability claim, the [Acting Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) [claimant]'s subjective claims of pain and disability as supported by the testimony of the claimant or other witness; and (3) the [claimant]'s educational background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d 5, 6 (1st Cir. 1982)).

B.  Paquet's Claims

Paquet claims that the ALJ erred at step 2 and also made three different errors in assessing her RFC.  Paquette's claims all lack merit.

1.  Step Two

Paquet begins her step-2 claim by asserting that "[t]he ALJ stated in his decision that [her] anxiety and depression were nonsevere impairment(s) because the evidence was insufficient to

_____

[7] At step 5, the burden of proof shifts to the Acting Commissioner, see Seavey, 276 F.3d at 5 (citing Arocho v. Sec'y of HHS, 670 F.2d 374, 375 (1st Cir. 1982)), but the Acting Commissioner's step-5 determination is not at issue here, so there is no need to describe the mechanics of step 5.

show that her anxiety and depression imposed more than a minimal [e]ffect on her ability to perform basic work-related tasks." Cl.'s Mem. of Law (doc. no. 8-1) 11-12 (emphasis added). However, what the ALJ stated in his decision was that Paquet had three severe impairments, including "major depressive disorder, recurrent, mild; and generalized anxiety disorder." Tr. 36. In other words, the ALJ expressly stated that Paquet's anxiety and depression <u>were</u> severe impairments.

In what seems to be a generous reading of Paquet's motion to remand, the Acting Commissioner understands Paquet to be claiming that the ALJ erred by failing to find that her bulimia was a severe impairment. If that is Paquet's claim, it fails.

Paquet correctly points out that "the Step 2 severity requirement is . . . a <u>de minimis</u> policy, designed to do no more than screen out groundless claims." Riel v. Berryhill, No. 18-cv-278-LM, 2019 WL 636883, at *6 (D.N.H. Jan. 25, 2019) (citations omitted) (quoting McDonald v. Sec'y of HHS, 795 F.2d 1118, 1124 (1st Cir. 1986)), R. & R approved by 2019 WL 635408 (Feb. 13, 2019). However, "[e]rrors at Step Two are harmless as long as the ALJ found at least one severe impairment, continued on with the sequential analysis, and considered the effect of all impairments [both severe and nonsevere] on the claimant's functional capacity." Id. (citations omitted).

Here, the ALJ found that Paquet had both severe and nonsevere mental impairments and continued on with the sequential analysis. Claimant is correct in observing that the ALJ did not mention her bulimia in his decision. But Paquet gave the ALJ no reason to mention that impairment. She did not list bulimia as a disabling impairment in her application for benefits. She did not mention bulimia at her hearing. And in her motion to reverse the ALJ's decision, she identifies no evidence in the record from which the ALJ could have drawn functional limitations resulting from her bulimia. Thus, even if Paquet is correct that it was a mistake for the ALJ not to have deemed her bulimia a severe impairment – and she points to no evidence that bulimia limited her ability to perform work-related activities – that error would have been harmless. See Venus v. Berryhill, No. 17-cv-482-PB, 2019 WL 157296, at *7-8 (D.N.H. Jan. 9, 2019) (ruling that ALJ's failure to mention claimant's medically determinable impairment of obesity anywhere in his or her decision was not reversible error where claimant did not: identify obesity as disabling impairment in his application, testify about obesity-related limitations at his hearing, allege how obesity limited his ability to work, or produce any evidence of obesity-related functional limitations greater than those in the ALJ's RFC assessment) (citing Desilets

v. Colvin, No. 15-cv-303-LM, 2016 WL 1275037, at *5-6 (D.N.H. Apr. 1, 2016)).

In sum, the fact that the ALJ did not deem claimant's bulimia to be a severe impairment at step 2 gives the court no reason to remand this matter.

### 2. RFC Assessment

Paquet claims that the ALJ erred in assessing her RFC by: (1) improperly weighing the opinions of her treating sources; (2) improperly assessing the credibility of her subjective complaints; and (3) inaccurately characterizing the facts in the record and, consequently, making an RFC assessment that was not supported by substantial evidence. The court considers each component of Paquet's claim in turn.

### a. Treating Source Opinions

Paquet claims that the ALJ failed to weigh the opinions of her primary care provider, Dr. Perez, and her therapist, Wayne Castro, in accordance with the applicable regulations.[8] The

---

[8] Claimant also mentions Dr. Gustavson's opinion in this section of her brief. However, Dr. Gustavson was not a treating source, and claimant does not develop an argument that the ALJ erroneously evaluated Dr. Gustavson's opinion. Accordingly, claimant has waived any argument that the ALJ improperly weighed Dr. Gustavson's opinion. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived") (citation omitted).

court begins with the regulations and then turns to the opinions at issue.

**The Regulations.** The regulations in force when the ALJ rendered his decision in this case describe a hierarchy under which, as a general matter: (1) the greatest weight, and sometimes controlling weight, is given to opinions from medical sources who have treated a claimant; (2) lesser weight is given to opinions from sources who have examined but not treated the claimant; and (3) the least weight of all is given to opinions from sources who have neither treated nor examined the claimant. See 20 C.F.R. § 404.1527(c)(1)-(2).[9] The regulations go on to describe a series of factors that an SSA adjudicator must consider when determining how much weight to give a medical opinion. See 20 C.F.R. § 404.1527(c)(2)-(6).

However, the regulations define the term "medical opinion" to exclude opinions on issues reserved to the Commissioner, such as "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work.'" 20 C.F.R. § 404.1527(d)(1). While treating-source opinions on issues reserved to the Commissioner are "never entitled to controlling weight or

---

[9] The rules in 20 C.F.R. § 404.1527 apply to claims, such as the one in this case, that were filed before March 27, 2017. For claims filed after that date, the rules for evaluating medical opinion evidence are set out in 20 C.F.R. § 404.1520c.

special significance," Social Security Ruling ("SSR") 96-5p, 1996 WL 374183, at *2 (S.S.A. July 2, 1996),[10] such opinions "must never be ignored," id. at *3, and an ALJ "must explain the consideration given to [such] opinion(s)," id. at *6.

**Dr. Perez's Opinions.** The opinions by Dr. Perez that are at issue here appear in the two letters quoted above. Those letters communicate nothing more than opinions on issues reserved to the Acting Commissioner.[11] In his decision, the ALJ noted that, and then went on to say that Dr. Perez's opinions: (1) were not supported by Paquet's mental-health treatment records; (2) were inconsistent with her traveling back and forth from New Hampshire to Canada and Florida; and (3) were inconsistent with her statement that she stopped working in 2013 in order to care for her stepson. See Tr. 45. In other words, as directed by SSR 96-5p, the ALJ "consider[ed] the supportability of [Dr. Perez's] opinion[s] and [their] consistency with the record as a whole," 1996 WL 374183, at *3, when deciding to give them "little weight," Tr. 45. Thus, the

---

[10] SSR 96-5p was rescinded on March 27, 2017, but was in effect when the ALJ rendered his decision in this case. See Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 Fed. Reg. 15263-01, at *15263, 2017 WL 1105348 (S.S.A. Mar. 27, 2017).

[11] For her part, claimant does not appear to recognize that Dr. Perez's opinions fall under 20 C.F.R. § 404.1527(d) (medical opinions on issues reserved to the Commissioner) rather than § 404.1527(a)(1) (standard medical opinions).

court cannot agree with claimant that the ALJ failed to evaluate Dr. Perez's opinions according to the SSA's regulations and guidance. That, in turn, reduces Paquet's claim to an assertion that when considering the appropriate factors, the ALJ erred in his resolution of conflicts in the evidence. But the resolution of conflicts in the evidence is for the ALJ, not the courts. See Purdy, 887 F.3d at 13. Accordingly, the ALJ's evaluation of Dr. Perez's opinions provides no basis for a remand.

**Mr. Castro's Opinion.** In his Mental Impairment Questionnaire, Mr. Castro opined that if Paquet were working, she would miss more than four days of work each month because of her impairments or treatment for them. At Paquet's hearing, the VE testified that a person who needed to miss that much work would be unable to do any job.

In his decision, the ALJ gave Mr. Castro's opinion limited weight and explained his evaluation of that opinion this way: "This opinion is accorded little weight as it was made by a non-acceptable medical source and there are no clinical observations in the record to support it." Tr. 44. Claimant counters by pointing to a Manchester School District report of her leave-time balance for the 2013-2014 school year. That report shows that during September, October, and November of 2013, i.e., the three months of that school year she worked full time, she used a total of five days of sick leave (two in September, one in

October, and two in November) and one day of personal leave (in November).[12]

Under 20 C.F.R. § 404.1527(f)(1), the ALJ was obligated to evaluate Mr. Castro's opinion by applying the factors listed in § 404.1527(c)(1)-(6). He did so, and gave that opinion little weight because it was not well supported by "medical signs and laboratory findings," 20 C.F.R. § 404.1527(c)(3). Claimant does not challenge the ALJ's supportability finding by identifying medical signs or laboratory findings that support Mr. Castro's opinion. Rather, she argues that Mr. Castro's opinion was "consistent . . . with . . . [another aspect of] the record as a whole," 20 C.F.R. § 404.1529(c)(4), i.e., her employment records. But those records show that Paquet used three days or less of sick and personal leave in each of the three months she worked full-time during the 2013-2014 school year, which is hardly consistent with Mr. Castro's opinion that she would miss more than four days of work each month due to her impairments or treatment for them. Thus, there is nothing in the way that the

---

[12] In her memorandum, claimant points to a notation on her leave report indicating that she accrued 23.5 days of unpaid leave during the 2013-2014 school year, but all of that leave accrued after she took a leave of absence on December 9, so it not clear how that figure casts any light on the amount of time she would need to take off from work if she were still working.

ALJ handled Mr. Castro's opinion on absenteeism that warrants a remand.[13]

### b. Subjective Complaints

Next, Paquet claims that "the ALJ erred in assessing [her] subjective complaints and credibility."  Cl.'s Mem. of Law (doc. no. 8-1) 14.  The court begins by describing the applicable legal principles and then turns to Paquet's challenges to the manner in which the ALJ assessed her subjective complaints.

But first, it is important to note that the ALJ did not assess Paquet's credibility.  To be sure, both the ALJ and Paquet cited and relied upon SSR 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996), which uses the concept of credibility, rather than SSR 16-3p, 2016 WL 1119029 (S.S.A. Mar. 16, 2016), which was issued about two months before the ALJ's decision, rescinded SSR 96-7p, and disavowed the concept of credibility.  But even though he cited SSR 96-7p rather than SSR 16-3p, the ALJ never used the term "credibility" in his decision.  Thus, claimant's

---

[13] Paquet challenges only the ALJ's evaluation of Mr. Castro's opinion on absenteeism, see supra, note 4, but the reasons the ALJ gave for discounting that opinion apply with equal force to Mr. Castro's opinions on Paquet's capacities for social interaction and for maintaining concentration, persistence, or pace.

use of that term in her memorandum of law is a bit of a red herring.[14]

**Legal Principles**.  When evaluating a claimant's symptoms, an ALJ must employ a two-step process.  The first step is to determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce her alleged symptoms.  See SSR 16-3p, 2016 WL 1119029, at *3.  If so, the second step in the analysis is to evaluate the intensity and persistence of the claimant's symptoms and determine the extent to which they limit her ability to perform work-related activities.

When undertaking the second step, an ALJ must first determine whether the claimant's alleged symptoms are consistent with the objective medical evidence.  If not, then the ALJ must consider the other evidence in the record, including "statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the SSA's] regulations."  Id. at *5.  Those factors, set forth

---

[14] Moreover, because "SSR 16-3p is materially the same as its predecessor," Tellier v. U.S. Soc. Sec. Admin., Acting Comm'r, No. 17-cv-184-PB, 2018 WL 3370630, at *6 n.6 (D.N.H. July 10, 2018), the mere fact that the ALJ in this case relied "upon SSR 96-7p is not, standing alone, a reversible error," Venus, 2019 WL 157296, at *14.

in 20 C.F.R. § 404.1529(c)(3), and sometimes called the Avery

factors, see 797 F.2d at 29, include:

> 1. Daily activities;
>
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 2016 WL 1119029, at *7.

Here, the ALJ first determined that Paquet's "medically

determinable impairments could reasonably be expected to cause

[her] alleged symptoms." Tr. 41. Then he found that her

"statements concerning the intensity, persistence and limiting

effects of [her] symptoms [were] not entirely consistent with

the medical evidence and the other evidence in the record," id.

When making that finding, the ALJ paid considerable attention to

the objective medical evidence and also discussed many of the

Avery factors.  In other words, the ALJ performed precisely the
kind of analysis that is required by SSR 16-3p.

Even so, Paquet argues that the ALJ: (1) erroneously found
that her activities of daily living ("ADLs") were inconsistent
with her subjective complaints; (2) failed to discuss the side
effects of her medications;[15] (3) improperly relied upon a
purported failure to follow medical advice; and (4) incorrectly
found that a payment she received from her former employer,
after she stopped working, was inconsistent with her statement
that her symptoms rendered her unable to work.[16]  The court
considers each claim in turn.

**Activities of Daily Living.**  Paquet's most fully developed
claim is that when the ALJ considered her ADLs, in the context
of assessing the limiting effects of her primary symptom, i.e.,
pain, he ignored some evidence of impaired functioning and

---

[15] This claim, and the two that follow, appear in a section
of claimant's brief in which she contends that the ALJ's RFC
assessment was not supported by substantial evidence.  But these
claims fall more naturally under her contention that the ALJ
erred in his assessment of her symptoms.  Accordingly, the court
considers them here, rather in the section that follows.

[16] Claimant also devotes a paragraph in this section of her
brief to a discussion of her bulimia, but while she cites
medical records that refer to her diagnosis, she does not appear
to identify any record evidence of bulimia symptoms that reduced
her capacity to work.  So the point of the bulimia discussion in
a section of her brief devoted to the ALJ's assessment of her
subjective complaints is not at all clear, nor does she say
anything in that discussion that merits a remand.

erroneously inferred from certain other evidence that she was more capable than she actually was.

In support of this claim, Paquet identifies evidence concerning her ADLs that, in her view, demonstrates that she is disabled by her symptoms. However, in his decision, the ALJ identified contrary evidence, including: (1) Paquet's report to a doctor that "she was independent with all activities of daily living, which is inconsistent with her allegations of needing help," Tr. 41; (2) Paquet's own report that she quit her teaching job in part to take care of her mentally ill stepson; (3) her ability to travel to Florida and Canada; and (4) her ability to help her husband with work on their vacation home in Canada. And in an earlier section of his decision, the ALJ noted that Paquet did all the business bookkeeping associated with the operation of four apartment buildings that she and her husband owned.

According to claimant, the ALJ erred in assessing her symptoms because "the evidence [concerning her ADLs], when viewed as a whole in light of applicable law, supports her credibility and supports her disability claim." Cl.'s Mem. of Law (doc. no. 8-1) 16. But that is not the legal standard. Rather, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial

evidence." Tsarelka, 842 F.2d at 535.  Here, the ALJ's

determination that claimant's ADLs were inconsistent with her

claim to be disabled by her symptoms is supported by substantial

evidence, i.e., evidence that a reasonable mind could accept as

adequate to support his conclusion, see Purdy, 887 F.3d at 13.

Thus, Paquet's first approach to claiming that the ALJ

mishandled her subjective complaints provides the court with no

grounds for a remand.

**Side Effects from Medication.**  Paquet claims that "the ALJ

never discussed [the] reported side effects from medications she

listed in a Function Report."  Cl.'s Mem. of Law (doc. no. 8-1)

21-22.  Claimant is correct in her observation that the ALJ's

decision does not mention the three side effects she listed in

her Function Report.  But, her two-sentence argument on this

point is insufficiently developed to merit the court's

attention.  See United States v. Zannino, 895 F.2d 1, 17 (1st

Cir. 1990) ("It is not enough merely to mention a possible

argument in the most skeletal way, leaving the court to do

counsel's work, create the ossature for the argument, and put

flesh on its bones.").  Moreover, an

> ALJ is not required to address every Avery factor in
> [his] written decision for [his] evaluation to be
> supported by substantial evidence.  Ault [v. Astrue],
> [No. 10-cv-553-JL,] 2012 WL 72291, at *5 [(D.N.H. Jan.
> 10, 2012)].  Instead, the decision need only "contain
> specific reasons for the weight given to the
> individual's symptoms, be consistent with and

supported by the evidence, and be clearly articulated
so the individual and any subsequent reviewer can
assess how the adjudicator evaluated the individual's
symptoms." SSR 16-3p, 2016 WL 1119029, at *9
(emphasis added); see Anderson v. Colvin, 2014 DNH
232, 2012 WL 72291, at *7 (D.N.H. Nov. 4, 2014).

Freddette v. Berryhill, No. 17-cv-672-PB, 2019 WL 121249, at *9
(D.N.H. Jan. 7, 2019).  The ALJ's discussion of claimant's
symptoms, which touches on many of the Avery factors, meets the
standard described in Fredette.

     In light of Zannino and Fredette, Paquet's side-effects
claims gives the court no reason to remand this matter.

     **Failure to Follow Medical Advice.**  Paquet claims that
"[t]he ALJ asserted [that she] failed to follow medical advice
because she had discontinued taking Ibuprofen, as she was
instructed to do by Dr. Kleeman prior to back surgery."  Cl.'s
Mem. of Law (doc. no. 8-1) 22.  Like Paquet's side-effects
claim, her one-sentence medical-advice claim is insufficiently
developed to merit the court's attention.  See Zannino, 895 F.2d
at 17.  Moreover, the factual premise of Paquet's medical-advise
claim is faulty.  The ALJ did note that "the claimant reported
that she had stopped taking Ibuprofen," Tr. 41, but he did not
label that decision a deviation from medical advice.  And, in
any event, advice or no advice, being able to get by without a
pain medication is evidence of the intensity of a person's pain.

Thus, Paquet's medical-advice claim provides no basis for a remand.

**2014 Income.** At step 1 of the sequential evaluation process, the ALJ found that Paquet had "engaged in substantial gainful activity after [her] alleged onset date," Tr. 35, because her "earnings record reflect[ed] that she was employed [by] the Manchester School District in the first quarter of 2014 and earned $4,037.00 in that quarter," id. Later on in his decision, the ALJ used claimant's purported work after December 9, 2013, as evidence suggesting that she was not as limited by her symptoms as she alleged she was. See Tr. 43. However, Paquet asserts, and respondent concedes, that the money claimant received in 2014 from the Manchester School District "was money owed to [her] by a previous employer and [that] the school system provided a letter stating that her last day of employment was December 6, 2013," Cl.'s Mem. of Law (doc. no. 8-1) 23 (citing Tr. 224). Thus, all agree that substantial gainful employment after claimant's alleged onset date – of which there was none – did not give the ALJ a valid basis for discounting the limiting effects of her symptoms.

However, the ALJ identified more than enough other evidence to support his conclusion on this point. First, he identified objective medical evidence tending to show that claimant's symptoms were not as limiting as she alleged. Then, as the

26

court has noted, the ALJ identified several ADLs that undermined her allegations. Beyond that, the ALJ also discussed the effectiveness of claimant's medications and the other forms of treatment she had used to address her symptoms. Given that it is the job of the ALJ to weigh the evidence, see Purdy, 887 F.3d at 13, and given the ALJ's identification of substantial evidence to support his conclusion, the court cannot say that his incorrect attribution of claimant's 2014 income to substantial gainful activity merits a remand.

### c. Describing the Record

Paquet's final claim is somewhat difficult to characterize. It bears this heading: "The ALJ's Residual Functional Capacity Assessment Was Not Supported by Substantial Evidence in the Record," Cl.'s Mem. of Law (doc. no. 8-1) 20, and it lists five criticisms of the ALJ's decision. The court has considered three of those criticisms in the context of its discussion of the ALJ's assessment of claimant's symptoms. Thus, only two remain.

First, Paquet claims that the ALJ erred by failing to consider her bulimia when assessing her RFC. However, as the court has noted, claimant has identified no evidence of functional limitations resulting from that impairment, so the ALJ cannot be faulted for declining to consider Paquet's bulimia when assessing her RFC. Second, Paquet claims that "[t]he ALJ

erroneously concluded that he accorded limited weight to the opinion letter from Ms. Anne Talbot Kleeman," Cl.'s Mem. of Law (doc. no. 8-1) 22.  That claim is unclear, at best, and in any event, claimant does not indicate how the ALJ's evaluation of Ms. Kleeman's letter resulted in an RFC that was not supported by substantial evidence.  In short, neither of the two claims described in this section merits a remand.

## IV. Conclusion

Because the ALJ has committed neither a legal nor a factual error in evaluating Paquet's claim, see Manso-Pizarro, 76 F.3d at 16, her motion for an order reversing the Acting Commissioner's decision, document no. 8, is denied, and the Acting Commissioner's motion for an order affirming her decision, document no. 9, is granted.  The clerk of the court shall enter judgment in favor of the Acting Commissioner and close this case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

April 4, 2019

cc:  Judith E. Gola, Esq.
     Jessica Tucker, Esq.